**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| WILLIAM JONES, on behalf of himself and others similarly situated, | ) ) Case No.: 6:15-cv-01637-RBD-DAB |
| Plaintiff, | ) ) |
| vs. | ) ) |
| WAFFLE HOUSE, INC., *et al.*, | ) ) |
| Defendants. | ) ) ) |
| _____ | ) |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, Plaintiff William Jones

("Plaintiff" or "Jones") respectfully moves the Court for an Order:

(1) Certifying the following classes:

**No Pre-Adverse-Action Notice Class:**  All persons who applied for employment with Waffle House, Inc. and its subsidiaries ("Waffle House") as hourly employees in the United States from October 1, 2010 until March 27, 2015 (and in North Carolina from October 1, 2010 until June 6, 2011), and (a) on whom Waffle House ran background checks using The Source for Public Data, LP ("Public Data"), (b) whom Waffle House did not hire, and (c) to whom Waffle House did not provide copies of: (i) their background reports, or (ii) a written summary of rights under the Fair Credit Reporting Act.

**No Post-Adverse-Action Notice Class:**  All persons who applied for employment with Waffle House as hourly employees in the United States from October 1, 2010 until March 27, 2015 (and in North Carolina from October 1, 2010 until June 6, 2011), and (a) on whom Waffle House ran background checks using Public Data, (b) whom Waffle House did not hire, and (c) to whom Waffle House did not provide notices pursuant to 15 U.S.C. § 1681m(a).

**Inadequate Pre-Adverse-Action Notice Class:**  All persons who applied for employment with Waffle House as hourly employees in the United States (but excluding North Carolina) from October 1, 2013 until March 27, 2015, and (a) on whom Waffle House ran background checks using Public Data, (b) whom Waffle House did not hire, and (c) to whom Waffle House provided notices that directed applicants to dispute inaccurate or incomplete information in their background reports with the public-record source.

1

**Inadequate Post-Adverse-Action Notice Class:**  All persons who applied for employment with Waffle House as hourly employees in the United States (but excluding North Carolina) from October 1, 2013 until March 27, 2015, and (a) on whom Waffle House ran background checks using Public Data, (b) whom Waffle House did not hire, and (c) to whom Waffle House failed to provide a notice that applicants had a right: (i) to obtain free copies of their background reports from Public Data within 60 days, or (ii) to dispute with Public Data the accuracy or completeness of any information in the background report furnished by Public Data.

**Catchall Class:**  All persons who applied for employment with Waffle House as hourly employees in the United States from October 1, 2010 until March 27, 2015 (and in North Carolina from October 1, 2010 until June 6, 2011) on whom Waffle House ran background checks using Public Data.

The proposed classes exclude counsel representing the classes; Defendants; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and persons who have released their claims against Defendants.  A table identifying each of Plaintiff's claims, the class on whose behalf they are brought, and against which defendant is attached to the Declaration of Justin Kachadoorian as Exhibit P.

(2)  Appointing Plaintiff as Class Representative.

(3)  Appointing Plaintiff's counsel, CounselOne, PC, as Class Counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

After working at Waffle House restaurants as his primary means of employment since 1988 without issue, Plaintiff William Jones reapplied for a position at Waffle House in Ormond Beach, Florida in December 2014.  For the first time in his life Waffle House denied him a job.  Before denying his application Waffle House obtained a background report on Plaintiff from Public Data.[1]  The search returned a record of criminal convictions which, according to Waffle House's policies, disqualified Jones from the job.  Waffle House never notified Jones that it

---

[1]  As used herein, "Public Data" collectively refers to Shadowsoft, Inc., Dale Bruce Stringfellow, and Harlington-Straker Studio, Inc., as well as The Source for Public Data, LP.

intended to deny his application for employment, nor did it provide him with a copy of the background report it obtained from Public Data.

Jones's experience was not unique. Until March 2015 Waffle House routinely denied applicants jobs based on background reports obtained from Public Data without giving them proper notifications under the Fair Credit Reporting Act, 15 U.SC. § 1681 *et seq.* ("FCRA"). Instead of complying with that law, Waffle House refused to accept that Public Data was a consumer reporting agency (CRA). Public Data perpetuated this error by attempting to disclaim its status as a consumer reporting agency and its legal obligations under the FCRA.

Plaintiff brought suit against Waffle House and Public Data for numerous violations of the FCRA and now seeks to certify three classes of hourly applicants from October 1, 2010 to March 27, 2015 on whom Waffle House procured background reports from Public Data. For the reasons discussed herein, the proposed classes meet the requirements of Federal Rule of Civil Procedure 23 and should be certified. In the alternative, the Court should defer ruling on the Motion until further discovery can be completed.

## **BACKGROUND**

Waffle House is a nationwide restaurant chain based in Norcross, Georgia, that owns and operates approximately 1,500 restaurants across the United States.[2] (Deposition of John Fervier ("Fervier Depo") attached to Kachadoorian Decl. as Ex. D, at 32:4-19.)

To improve safety at its restaurants Waffle House began running background checks on management applicants using a consumer reporting agency named InfoMart in 2005. (Fervier

---

[2] There are also several hundred Waffle House franchisees, *see* Fervier Depo 32:9-16, and documents produced show that Waffle House's background-check procedures applied to at least some of them, *see id.* at Ex. 28 (stating that hourly background screening report can be used by franchisees), though Waffle House's corporate designee denied this. (*Id.* at 32:24-33:6.)

Depo 75:12-76:3; 37:21-38:16; Ex. 18.)  Three years later, in 2008, Waffle House decided to

perform criminal background checks on all hourly applicants.  (*Id.* at 39:9-15; 42:1-8.)  The sheer

volume of hourly applicants presented real problems for Waffle House.  Because turnover at

Waffle House is so high—118 percent a year—Waffle House is continuously hiring. (*Id.* at 53:7-

23; 56:16-57-6; 59:2-4; Ex. 11.)  Consequently, the number of applicants during the relevant time

period was large, ranging from 30,000 to 60,000 a year.  (*Id.* at 238:22-239:4, Exs. 49, 54.)  Waffle

House had to perform background checks quickly so that it could hire employees before they found

other employment and thereby ensure restaurants were adequately staffed.  (*Id.* at 53:7-23; 73:17-

74:8.)  With such a large number of applicants, cost was also a concern.  (*Id.* at 57:18-22.)  InfoMart

charged Waffle House $32 per management applicant, and if Waffle House paid a similar amount

for each hourly applicant, the cost of background checks would easily exceed six figures a year.

(*Id.* at 72:11-73:4, Ex. 54 at WH002425.)

In search of a fast and cheap alternative to the standard consumer-reporting agencies,

Waffle House stumbled upon Public Data, a data aggregator located in Irving, Texas that sold

background checks for literally cents on the dollar.  (Fervier Depo 47:1-6; 50:17-51:3.)  By Waffle

House's own estimate Public Data charged about two cents per applicant.  (Fervier Depo, Ex. 54

at WH002425; Deposition of Dale Bruce Stringfellow taken in *Wilson v. The Source for Public*

*Data, LP* ("1st Stringfellow Depo"), attached to Kachadoorian Decl. as Ex. E, at 57:10-58:17.)

And the results were instantaneous.  (Fervier Depo 50:17-51:3.)

There was a catch of course.  Public Data claimed not to be a CRA at all but merely a

source of public records.  (Deposition of Dale Bruce ("2nd Stringfellow Depo"), attached to

Kachadoorian Decl. as Ex. C, at 164:14-165:8, Ex. 6.)  It claimed merely to provide customers

with a searchable database of public records.  (*Id.*)  As such, Public Data feels no need to verify

the accuracy of the records it makes available to customers and refuses to do so, nor will Public

Data correct or remove inaccurate or dated records when being notified of them.  (2nd Stringfellow

Depo 167:23-168:3.)  Instead Public Data requires the subjects of its reports to correct the

information at the originating public source.  Even when this happens Public Data's records do not

reflect changes until Public Data acquires an update, sometimes months in the future.

In many cases Public Data spends substantial sums of money to acquire public records

that are not immediately accessible to the public.  (2nd Stringfellow Depo 94:7-18.) For a fee

customers perform a search on Public Data by using an individual's personal identifying

information (typically first, last, and middle name, and date of birth).  (*Id.* at 166:5-17.)  In response

to a query Public Data collects information about that individual from the various public sources

it has acquired and presents the information to customers in the form of a list; each entry on the

list contains public-record information.  (99:11-14; 100:18-101:9; 101:17-103:9.)

Although feigning total ignorance of who its customers are, Public Data is aware that its

customers use its reports for employment purposes and has specifically advertised to this

demographic.  (2nd Stringfellow Depo. 26:17-23, 27:16-28:1, 46:5-11, 137:4-17; 1st Stringfellow

Depo 134:14-30.)   Nevertheless Public Data stoutly contends that it is not a CRA and disclaims

liability under the FCRA.  (2nd Stringfellow Depo, Ex. 6 (terms of use containing a disclaimer

stating that Public Data is not a CRA or subject to the FCRA).)  Consistent with this stance Public

Data takes no measures to ensure FCRA compliance.  (1st Stringfellow Depo 42:6-14.)

Waffle House knew that by using Public Data to run background checks it was playing

fast and loose with the FCRA.  (Fervier Depo 138:14-23; 260:5-19 ("Whether or not PublicData

is a consumer reporting agency, we don't know."), Ex. 54 at WH002421-2 (memo from Security

Direct Jeff Wright warning of potential FCRA liability from using Public Data and advising Waffle

House to switch to InfoMart to "bring us closer to FCRA compliance").)  But it decided to take the risk anyway.  Indeed so acute was the need to run background checks quickly and cheaply that Waffle House continued using Public Data until March 2015—even after responsible persons within the Waffle House organization declared that Public Data was "practically useless."  (Fervier Depo, Ex. 52; *see also* Ex. 46 (email from Security Director Jeff Wright stating "Public Data is clearly not acceptable").)  For years Waffle House knew that Public Data reported old or inaccurate information but continued to use Public Data nonetheless.  (Fervier Depo 241:17-242:25, Exs. 50, 53 (email from Director of Security Jeff Wright stating that use of Public Data "is causing us to misidentify subjects"), 54 at WH002421.)

One of the advantages of ignoring Public Data's status as a CRA was that Waffle House could let its own FCRA compliance slip.  This was most obvious with the notifications Waffle House was required to provide applicants who had been rejected based on Public Data's background reports.  Waffle House has not produced a single pre- or post-adverse action notice actually sent to rejected applicants.  (Kachadoorian Decl. ¶ 28, Ex. L.)  Waffle House has provided templates (albeit only for part of the class period), but the templates conspicuously failed to inform applicants that they could contest the results of the background check with Public Data itself; rather, Waffle House, taking its cue from Public Data, explicitly instructed applicants to follow a long and involved process of correcting inaccurate information with the public entity.  (Fervier Depo, Ex. 19, at WH000227.)  The notices also instructed applicants to ask Waffle House rather than Public Data for a copy of their reports.  (*Id.*)

Sometime in 2013 or 2014 Waffle House apparently sent out at least some of these notifications, because Public Data began receiving phone calls and letters from rejected applicants contesting information in their reports.  (*See* 2nd Stringfellow Depo 126:21-132:6.)  Public Data did

not like being thus put upon. It had not been contacted by Waffle House applicants before then, and it would not be again. (*Id.*) Public Data made sure of this by calling Waffle House and bluntly telling it to stop sending the letters to applicants. (*Id.*) Waffle House acceded. After this conversation Public Data stopped receiving communications from Waffle House applicants. (*Id.*) A lawsuit filed by two applicants in March 2014 specifically charged Waffle House with failing to provide pre- and post-adverse action notices, and a contemporaneous lawsuit filed by the same plaintiffs named Public Data as a defendant. (Kachadoorian Decl., Exs. M, N.)

On March 27, 2015, soon after Plaintiff sent Waffle House a letter advising it of his claim, Waffle House stopped using Public Data. (Fervier Depo 46:14-47:10, Ex. 65 at WH002529.) [3]

## ARGUMENT

Rule 23 of the Federal Rules of Civil Procedure states, "[a] class action may be maintained if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (i.e., numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b)." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 394 (2010).

## I. The Proposed Class Satisfies the Requirements of FRCP 23(a).

### A. The Proposed Class Members Are Sufficiently Numerous.

Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Both Waffle House and Public Data have produced documents showing that the number of persons answering to the class definitions is in the thousands. (Fervier Depo 238:22-239:4, Exs. 27 (table generated by IT department showing

---

[3] Waffle House stopped using Public Data to run criminal background checks on hourly applicants in North Carolina starting on June 6, 2011. (Fervier Depo, Ex. 45.)

number of background reports run, including the number of rejected applicants), 49, 54, 73, 89 (indicating that 5,021 applicants failed the background check in 2013); 2nd Stringfellow Depo 132:23-133:7, Ex. 4.)    Moreover, Waffle House has explicitly stipulated to numerosity. (Kachadoorian Decl., Ex. B (responses to interrogatory nos. 1-4.)   Furthermore, the class as defined is sufficiently ascertainable because it provides the objective criteria needed to determine the members of the class.   *See Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D.Cal.1999).  Waffle House maintains records of each and every person who applied for an hourly position but who was not hired during the class period, and both Waffle House and Public Data maintain records showing the applicants on whom background checks were run, who failed the background check, and who received or did not receive pre- or post-adverse action notices. (Fervier Depo 97:6-11 (noting that security administrators entered code "BC Failed" in computer system); 100:20-101:12l 108:10-109:8; 2nd Stringfellow Depo  163:11-16.)  Because the class can be specifically determined through discoverable access to Defendants' data, *see Whitaker v. Bennett Law*, 2014 WL 5454398, at *3 (S.D. Cal. Oct. 27, 2014), the class is certifiable.

## B.  Plaintiff's Claims Present Common Questions of Law and Fact.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).   Courts should "liberally construe[] the commonality requirement."   *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198-99 (S.D.N.Y. 1992) (internal citations omitted). To satisfy this requirement, there need be only a single issue common to the class.  *See Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C.1992), *aff'd* 6 F.3d 177 (4th Cir.1993). "Commonality does not mandate that all class members make identical claims and arguments, only that common issues of fact or law affect all class members."  *Trief* at 144.

The claims asserted in this case raise a number of legal and factual questions that can be decided on a common basis. The overriding legal question raised in this lawsuit is whether Public Data is a "consumer reporting agency" under the FCRA. *See Berry v. Schulman*, 807 F.3d 600, 609-610 (4th Cir. 2015)(certifying class under the FCRA where central question was whether defendant failed to treat background reports as "consumer reports" under the FCRA). The answer to this question "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart v. Dukes*, 131 S.Ct. 2541, 2551 (2011). Many of the other common questions can be resolved once this central question has been answered. For example, if Public Data is a CRA, then Waffle House was required to provide, and Public Data was required to obtain, certifications before consumer reports could be issued. *See* § 1681b(b)(1)(A), 1681b(f), 1681e(a). Whether there are any certifications is a common factual question driven by the legal status of Public Data as a CRA *vel non*.

The coverage issue also bears on the notices that Waffle House was required to provide to applicants whom it rejected based on their Public Data background reports, e.g., whether Waffle House was required to provide, and did provide, applicants with copies of their reports and the FCRA Summary of Rights promulgated by the FTC and Bureau of Financial Protection *before* taking adverse employment action, and whether Waffle House provided them with post-adverse action notices that apprised them of their right to dispute information in their files with the CRA and their right to obtain a free report within 60 days. *See* 15 U.S.C. §§ 1681b(b)(3), m(a). In like manner, if Public Data is a CRA, it would be required to provide Waffle House with user notices under section 1681e(d) apprising Waffle House of its responsibilities under the FCRA, and common evidence can establish that Public Data provided no such notices to Waffle House. (*See* Fervier 81:17-82:13; 2nd Stringfellow Depo 158:17-23.)

9

Willfulness is also a common question.  To obtain statutory damages under the FCRA, the proposed class must demonstrate that Defendants' conduct was willful. 15 U.S.C. § 1681n(a)(1). "[T]he inquiry is to [defendant's] state of mind in implementing its policies and procedures, not on the customer's particular interaction with the CRA…. To prove willfulness here, a consumer-by-consumer inquiry is not necessary." *Chakejian v. Equifax Info. Servs. LLC*, 256 F.R.D. 492, 500 (E.D. Pa. 2009).  Because this lawsuit challenges Defendants' policies and procedures, common questions arise over whether under *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56 (2007) those policies and procedures were reckless, namely, whether Defendants' acted recklessly by concluding that Public Data was not a CRA.

## C.  Plaintiff's Claims Are Typical of the Class Claims.

Typicality under Rule 23(a)(3) is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2nd Cir. 1997).  The facts of the named plaintiff's claim need not be identical to that of the putative class as long as "the disputed issue of law or fact occup[ies] essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999) (citation omitted).  "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the [absent] class members, and if it is based on the same legal theory." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992).

Plaintiff's claims are typical of those of the putative class.  Like other class members, Plaintiff applied to work as an hourly employee at Waffle House but was denied a job based on a background report procured from Public Data without being provided with pre- or post-adverse

10

action notices.  (Jones Decl. ¶ 9; Kachadoorian Decl., Ex. O at WH000007.)  And just as with

other class members, Waffle House never provided Public Data with the necessary certifications

before Public Data furnished Plaintiff's background report to Waffle House and before Waffle

House used it.  (Fervier Depo 76:11-80:24; 2nd Stringfellow Depo 157:7-12.)  Finally, to the extent

this class is certified, Plaintiff has agreed to forego any claim he has for actual damages and to

seek only statutory damages, which is the exact same remedy sought on behalf of the putative

class.  Therefore the typicality requirement is satisfied.

Defendants will argue that typicality is not satisfied because they have challenged

Plaintiff's standing based on the assertion, in the teeth of evidence, that Waffle House never

obtained a background report on him, though it did for every other qualified hourly applicant.  This

argument does not defeat typicality because Plaintiff's claims arise from the same practices and

course of conduct that give rise to the claims of the members of the class and are based on the

same legal theories.  The principal evidence in this case, which will be used to prove liability as to

all putative class members, is Defendants' policies and practices—specifically Waffle House's

policy of obtaining a background report on *all* qualified applicants during the class period from

Public Data.  And the central disputed legal issue in this case—i.e., whether Public Data as a

CRA—occupies the same degree of centrality for Plaintiff's claims as it does for other unnamed

class members.[4]

Plaintiff has argued at length in his opposition to Defendants' Rule 12(b)(1) motions why

Defendants' assertion that Waffle House did not obtain a background report on him from Public

Data is not to be believed.  [DE 49, 56.]  Indeed even at the pleading stage a preponderance of

---

[4]  Defendants are obviously trying to defeat this class action by knocking out the named plaintiff, no doubt in response to the flood of lawsuits brought against them in recent years over FCRA compliance.  *See* Kachadoorian Decl., Ex. A (response to interrogatory no. 7), Ex. B (response to interrogatory no. 9).

evidence refuted that contention. Moreover, evidence now shows that Plaintiff was highly qualified to work as a server at Waffle House because he had many years of experience with the company and that Waffle House only runs background checks at the end of the application process, when the unit managers determine that a candidate is needed and qualified. (Fervier Depo 87:24-88:19, Ex. 36 at WH000995 (flowchart showing background checks coming at end of application process); Jones Decl. ¶¶ 2, 3.) Waffle House must pay to run each background check, is very sensitive to this expense, and therefore will only run a background check when it is ready to hire a candidate. (Fervier Depo, Ex. 54 at WH002425; Ex. 36 at WH000995.) Furthermore, Waffle House prefers hiring servers with experience, particularly experience working at Waffle House, and has the acutest need around the holiday, starting in November. (Fervier Depo 59:20-60:10; 61:17-62:6; 69:13-70:11.) Thus the most likely reason for Waffle House's refusal to hire Jones was his criminal record, which Waffle House would have only obtained from Public Data. Jones has criminal convictions that would have disqualified him from employment according the Waffle House's criminal conviction matrix. *Id.* at Ex. 17. Hence Waffle House's conduct in not hiring Jones is consistent with its general policy of denying employment to ex-offenders with certain convictions identified through Public Data background reports. Waffle House admits that it cannot point to a single applicant other than Plaintiff whose personnel record shows a background check was run when it actually was not. (*Id.* at 109:23-110:16.)

The Court should not find Plaintiff's claims atypical in the face of this mountain of circumstantial evidence. Moreover, Plaintiff's claims are not arbitrable for a whole host of reasons described in his opposition to Waffle House's Motion to Compel Arbitration. [DE 83.] To the extent that the Court is inclined to deny certification based on typicality ground, Plaintiff requests leave to replace Jones with a different representative plaintiff. *See* Section I.D, *infra*.

### D. The Class Will Be Adequately Represented.

In evaluating adequacy, the Court must consider whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement exists to ensure that the class representatives will 'have an interest in vigorously pursuing the claims of the class, and … have no interests antagonistic to the interests of other class members.'" *Toure v. Cent. Parking Sys.*, 2007 WL 2872455, at *7 (S.D.N.Y. Sept. 28, 2007).

Here, neither Plaintiff nor his counsel has any conflicts of interest with other class members, and their interests are reasonably co-extensive. (Kachadoorian Decl. ¶ 34.) *See General Telephone Co. of the Southwest v. Falcon*, 457 U.S.147, 157-8, n.13 (1982). Moreover, Plaintiff will limit his recovery to statutory damages, which he will pursue on behalf of the class. (Jones Decl. ¶¶ 15, 16.) Therefore Plaintiff does not have claims unique from other putative class members. Plaintiff and his counsel have been committed to vigorously prosecuting this action. (Jones Decl. ¶ 12; Kachadoorian Decl. ¶ 35.) Plaintiff has engaged in many lengthy conversations with his attorneys relating to this case—both pre- and post-filing—and has come forward to sue a company where he was employed for a large part of his working life. (Jones Decl. ¶¶ 2, 3.) He has assisted his counsel in responding to Defendants' extensive written discovery, produced documents, executed declarations, and has made himself available for deposition (which is currently scheduled for June 14, 2016). (Jones Decl. ¶ 12; Kachadoorian Decl. ¶ 35.) He has remained in contact with Plaintiff's counsel and has been available for discussions throughout his travels from Florida to Virginia to Missouri. (*Id.*) And he has done so even with only a small prospect for either large or immediate recovery. (Jones Decl. ¶¶ 14-16.)

Defendants will contend that Plaintiff is not adequate to represent the class because of his criminal record and his currently pending criminal case. These arguments are unpersuasive. A

13

proposed class representative must only be adequate, not perfect; he "will not be automatically rejected based solely upon his criminal record, [because] adequacy must be assessed in light of their [the representative's] conduct in this or previous litigation." *Milbourne v. JRK Residential America, LLC*, 2014 WL 5529731, at *7 (E.D. Va. Oct. 31, 2014).  Plaintiff's commitment to this case, as discussed above, demonstrates that he is adequate to serve as a class representative. *See Milbourne* at *7 (finding named plaintiff's "lengthy" criminal record did not disqualify him from serving as class representative).  More to the point, criminal convictions come with this sort of FCRA terrain.  "While he does have a criminal record, one would imagine that it would be difficult to find a plaintiff in this case, at least in the Adverse Action class, who did not have some sort of criminal past, because the premise of this lawsuit is that the class members suffered impermissible adverse action based on what a background check unearthed." *Id.* at *7-8.[5]

Finally, Plaintiff's counsel have substantial experience litigating class action lawsuits, including consumer privacy suits.  (Kachadoorian Decl. ¶¶ 32, 33; Pascucci Decl., *passim*.)

## II.    The Proposed Class Satisfies the Requirements of FRCP 23(b)(3).

The present action also satisfies the requirements of Rule 23(b)(3) because common questions of law or fact predominate over any purported individual questions, and a class action is the superior method for the fair and efficient adjudication of this controversy.

---

[5] Plaintiff's pending criminal case (which is totally meritless, based on mistaken identity, and will likely be dismissed) has not hampered Plaintiff's commitment to this action.  (Jones Decl., *passim*.)  To the extent that it threatens to interfere with Plaintiff's involvement in the future, the Court may reassess the propriety of certification or grant leave to add a substitute class representative. *See Harper v. Trans Union, LLC*, 2006 WL3762035, at *6 (E.D. Pa. Dec. 20, 2006)(noting that any typicality issues could be resolved by granting Plaintiff leave "to add a named representative whose claim arose prior to the allegedly applicable statutory cut-off date"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 375 B.R. 719, 729 (S.D.N.Y. 2007) ("where the claims of a lead plaintiff become moot at the pre-certification stage, courts not only may, but should, respond to the pre-certification mooting of a class representative's claims by permitting substitution of a new class representative.")

### 1.   Common Questions of Law or Fact Predominate.

Questions that are common to the class predominate over individual questions where a plaintiff alleges a common course of conduct, omissions, and other wrongdoing that affected all the class members in the same or similar manner.  *See Blackie v. Barrack*, 524 F.2d 891, 905-908 (9th Cir. 1975).  "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation."  *In re Visa Checks/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001).  This criterion is normally satisfied when there is an essential common factual link between all class members and the defendant for which the law provides a remedy. *Id.* at 136.

#### i.      The Predominant Question—Whether Public Data Is a CRA—Will Determine Defendants' Liability "in One Stroke."

Again, the predominant question that can be answered on a classwide basis using common proof is whether Public Data is a CRA.  *See Berry*, *supra*, 807 F.3d at 609-610 (finding predominance where central question was whether defendant was a CRA); *Huebner v. Radaris, LLC*, N.D. Cal., Case 3:14-cv-04735-VC, Apr. 12, 2016, p. 2 (certifying nationwide FCRA class where "the key questions are whether Radaris is a consumer reporting agency and whether it complies with the statutory obligations imposed on consumer reporting agencies.").

Public Data disclaims liability under the FCRA and brazenly contends that it need not comply with the law.  (2nd Stringfellow Depo, Ex. 6; 1st Stringfellow Depo 42:6-14.)  Therefore the central issues of this case, namely, whether Public Data is a "consumer reporting agency," and whether its background reports constitute "consumer reports," are questions that can be answered with reference to generalized evidence applicable to the entire class, rather than individual members.  *See Henderson v. Corelogic Nat'l Background Data, LLC*, No. 3:12CV97, 2016 WL

685127, at *4 (E.D. Va. Feb. 18, 2016) (holding criminal records returned in response to search queries by customers based on applicants' first and last names to be "consumer reports").

It is undisputed that Waffle House obtained criminal background reports on all qualified job applicants, *see Benzing v. Tharrington—Smith, LLP*, 2012 WL 169946, *5 (E.D.N.C. Jan. 19, 2012) (observing that criminal record information constitutes a consumer report under the FCRA), and that Public Data charged them a fee to obtain these reports. *See* 15 U.S.C. § 1681a(e)(defining CRA to mean a person who furnishes reports "for monetary fees [or] dues").  Therefore the key evidence when determining coverage is Public Data's knowledge or expectation that reports sold to Waffle House would be used for employment purposes under the FCRA, regardless of its attempts to disclaim liability.[6]  *See Firneno v. Radner Law Grp., PLLC*, No. 13-CV-10135, 2015 WL 4276340, at *4 (E.D. Mich. Mar. 31, 2015) ("If a consumer reporting agency provides a report based on a reasonable expectation that the report will be put to a use permissible under the FCRA, then that report is a "consumer report" under the FCRA[.]") (quoting *Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d 1264, 1274 (9th Cir. 1990)).  As discussed in section I.B above, the answer to this question also settles Waffle House's legal obligations to applicants.

---

[6] In 2013 the FTC filed an administrative complaint against Filiquarian Publishing LLC, Choice Level LLC, and their CEO, Joshua Linsk, alleging that they failed to ensure that the information they sold was accurate and would be used only for legally permissible purposes and also failed to tell users of their criminal record reports about their obligations under the FCRA, including the requirement to notify consumers if adverse actions were taken against them based on a report.  Both companies used disclaimers stating that they were not FCRA compliant; that their products were not to be considered screening products for employment, insurance, and credit screening; and that anyone who used their reports for such purposes assumed sole responsibility for FCRA compliance.  (Kachadoorian Decl., Exs. F-I.)  But according to the FTC, these disclaimers are not enough to avoid liability under the FCRA because the company advertised and expected that its reports could be used for employment purposes.  (*Id.*)  The FTC's settlement order prohibits the respondents from future FCRA violations.  (*Id.*, Ex. H.)  Plaintiff requests that the Court take judicial notice of the filings in *In the Matter of Filiquarian Publishing, LLC, et al.*, Case No. C-4401 and *U.S. v. Instant Checkmate, Inc.*, Case No. 14-CV-0675 (*see* Kachadoorian Decl., Exs. G-I) pursuant to Federal Rule of Evid. 201 because they are part of the court file in a government proceeding and are relevant to the issue of Defendants' liability as a consumer reporting agency under the FCRA.  *See Rosales-Martinez v. Palmer*, 753 F. 3d 890, 894 (9th Cir. 2014).

Moreover, the answer to this question will determine Defendants' liability relating to the certification requirements under 15 U.S.C. §§ 1681b(b)(1)(A), 1681b(f), and 1681e(a); Public Data's liability for failing to provide user and furnisher notices, as required under section 1681(d)(1); Public Data's liability for failing to provide the FCRA Summary of Rights, as required under section 1681b(b)(B); and Public Data's liability for failing to post a toll-free number on its website through which consumers can obtain free file disclosures pursuant to 15 U.S.C. § 1681 j(a)(1)(C) and 16 C.F.R. § 610.3. Common evidence establishes that Defendants failed to provide these required certifications, notices, and summary of rights, and that Public Data failed to post a toll-free number. (2nd Stringfellow Depo 200:18-201:17.)

Liability for these claims will therefore be determined based solely on whether Public Data is a CRA under law. *See Syed v. M-I LLC*, No. CV 1:14-742 WBS BAM, 2016 WL 310135, at *3 (E.D. Cal. Jan. 26, 2016) (certifying class action alleging claims that defendant violated FCRA by failing to provide certifications); *see also Vasquez-Estrada v. Collecto, Inc.*, No. 3:14-CV-01422-ST, 2015 WL 6163971, at *8 (D. Or. Oct. 20, 2015) ("Plaintiff may prove a violation [of 1681b(f)] either with proof that defendant's purpose in obtaining plaintiff's consumer report was improper *or* with proof it failed to certify that purpose.") (emphasis added); *Breese v. TRIADvantage Credit Servs., Inc.*, 393 F. Supp. 2d 819, 822 (D. Minn. 2005) (same).

### ii. *Common Questions Predominate Regarding Waffle House's Failure to Provide Pre- and Post-Adverse Action Notices.*

Common questions also predominate because Waffle House had standardized employment policies and practices applicable to each and every qualified applicant. (Fervier Depo 33:9-11, 36:25-37:4, 42:1-14, 47:1-10.) *See Thomas v. FTS USA*, LLC, 312 F.R.D. 407, 425 (E.D. Va. 2016) (certifying FCRA adverse-action class where employer had "standardized hiring procedures

and criteria" relating to background checks); *Milbourne*, *supra*, at *6, 11 (same).  Throughout the

class period Waffle House used a criminal conviction matrix when deciding whether to disqualify

applicants.  (Fervier Depo 95:20-97:18, Ex. 17.)  Applicants convicted of certain crimes and within

the timeframes identified on the matrix were disqualified regardless of other considerations such

as experience and nature of their job duties unless they successfully disputed the accuracy of the

convictions.  (*Id.* at Exs. 17, 19, 20.)

Moreover, as a matter of companywide policy Waffle House obtained background reports

from Public Data at the final stage of the application process, when it had already been determined

that the restaurant needed the applicant and the applicant was qualified.  (Fervier Depo 87:24-

88:19, Ex. 36 at WH000995 (flowchart showing background checks coming at end of application

process).)   Applicants on whom Waffle House obtained background reports had to pass a

preliminary screening through AON and successfully complete an interview with the restaurant

manager and either the division or district manager.  (*Id.; see also* Fervier Depo 182:9-12.)  Only

then did the manager submit the consent form to corporate security department to obtain a

background report.  (*Id.*, Ex. 36 at and WH001002 (memo explaining background check

procedure; "If candidate obtains AON Acceptance Number and position is available, then:  a. Have

candidate complete Full Written Application; and b. Interview candidate, If interview satisfactory

and position available, candidate must pass a Criminal Background Check.")  Waffle House had

to pay Public Data for each background report, and processing background checks entailed

additional costs, which Waffle House calculated to be two dollars per applicant.  (Fervier Depo

156:20-157:11, Ex. 54 at WH002425, Ex. 91 (invoices); 1st Stringfellow Depo 57:10-58:6.)  In

short, Waffle House would not have obtained a background report unless it was pretty sure it

wanted to hire the applicant.

This is common proof that denial of employment was based in whole or in part on the background reports. On similar facts numerous courts have certified FCRA adverse action classes where background reports were obtained late in the application process. *See Magallon v. Robert Half Int'l, Inc.*, 311 F.R.D. 625, 631 (D. Or. 2015) (certifying adverse action class under the FCRA where "[t]he background report typically is ordered late in the application process, after the applicant has interviewed and been matched to one or more possible placements."). The timing of Waffle House's procurement of the background reports is common evidence establishing that the denial of employment was wholly or partly based on the background reports, as required under section 15 U.S.C. § 1681b(b)(3). *See Reardon v. ClosetMaid Corp.*, No. 2:08-CV-01730, 2013 WL 6231606, at *18 (W.D. Pa. Dec. 2, 2013) (finding predominance where defendant had a companywide policy of procuring consumer reports late in the application process, notwithstanding defendant's argument that applicants may have been rejected for reasons unrelated to their reports); *Smith v. Res-Care, Inc.*, No. CIV.A. 3:13-5211, 2015 WL 461529, at *5 (S.D.W. Va. Feb. 3, 2015) (certifying adverse-action class where plaintiff alleged defendant failed to provide pre-adverse action notices).

Common proof will also establish which applicants did not receive pre- or post-adverse action notices. During the class period Waffle House's computer system automatically generated a notation for each applicant who failed the background check that read "BC Failed – On Public Data." (Fervier Depo 150:14-151:1, Exs. 30 at WH000893, Ex. 85 at WH000724.) Pursuant to company procedure Waffle House also saved copies of pre- and post-adverse action notices sent to applicants in a centralized database called the S-drive. (Fervier Depo 134:9-136:1, Ex. 21 at WH000256-8.) A comparison of applicants who failed their background checks, but for whom Waffle House has no record of either a pre- or post-adverse action notice, would establish liability

19

on behalf of the class.[7]  *See Manuel v. Wells Fargo Bank, Nat. Ass'n*, 2015 WL 4994549, at \*17 (E.D. Va. Aug. 19, 2015) (certifying adverse-action class where defendant's files coded applicants as "ineligible for hire" based on consumer reports); *see also Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 214 (E.D. Va. 2015) ("Common issues will predominate if 'individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim.'") (quoting *Newberg* § 4:50).

Waffle House may argue that that individual questions predominate because Waffle House rejected certain applicants based on criminal convictions admitted on job applications, but this argument is unconvincing.  First, Waffle House's records specifically show which applicants failed the background check based on a Public Data report rather than on admitted criminal convictions; the notation reads "BC Failed – On Public Data."  (Fervier Depo 150:14-151:1, Exs. 30 at WH000893, Ex. 85 at WH000724.)  Waffle House enters a different code where an applicant fails the background check because of an admitted conviction.  (Fervier Depo, Ex. 25 (memo on computer codes instructing personnel "If [applicants] do admit and we do NOT find anything = fail (NOTE: fail reason is ADMITTED)"), Ex. 39 (directing Waffle House personnel to "Enter fail into AS400 [and] Select category for fail"), Ex. 79 (identifying various codes).)

Moreover, Waffle House's software generated an entirely different letter to applicants who were denied based on admitted convictions, *see* Fervier Depo 122:18-123:11, Ex 19 at WH000226,

---

[7]  Testimony by Public Data suggests that Waffle House only sent pre- and post-adverse action notices for a short time during the class period, and ceased sending them when Public Data objected.  (*See* 2nd Stringfellow Depo 126:21-132:6.)  Moreover, Waffle House's own procedure documentation indicates that Waffle House did not always send out pre- and post-adverse action letters.  (Fervier Depo, Ex. 36 at WH001003 (security department memo stating that if an applicant fails the background check, he or she should be "terminate[d] immediately," i.e., without a pre-adverse action letter), Ex. 44 (procedures manual stating, "If candidate does NOT pass, then politely tell candidate that 'we have decided not to offer the position at this point.'").)

Ex. 20 at WH000259, Ex. 21 at WH000255-8), and Waffle House saved these letters in the S-drive using a different file name than it assigned to the pre-adverse action letters it was supposed to generate when an applicant failed the background check because of a Public Data search.  (Fervier Depo, Ex. 21 at WH000256 (requiring security administrators to save "admitted" pre-adverse-action letters in the Archive folder with the abbreviation "admpradvltr" in the file name, e.g., "MDH20100323admpradvltr").  Finally, Public Data fastidiously maintains records of every search done on its website, *see* 2nd Stringfellow Depo 173:11-16, so a comparison between Public Data's records and Waffle House's "BC Failed" list will reveal who failed the background check based on a Public Data report.  Thus there are multiple forms of common proof to determine liability once the class is certified.

Finally, even if some class members received pre- or post-adverse action notices[8] common questions predominate.  The template notices produced in discovery are facially non-compliant, and therefore subject to common resolution.  (Fervier Depo, Exs. 19, 20.)  The pre-adverse action notice provides a defective FCRA Summary of Rights to consumers.  The FCRA Summary of Rights properly informs consumers that they may contest the contents of a consumer report directly with the CRA.  (Fervier Decl., Ex. 22.)  *See* 15 U.S.C. § 1681m(a).  *See also* FTC Advisory Opinion to Eric J. Weisberg, Jun. 27, 1997, p. 2 ("The dispute rights are among the most important the FCRA gives consumers."), attached to Kachadoorian Decl. as Ex. J.  But Waffle House's pre-adverse-action notices, even those attaching the FCRA Summary of Rights, misinform applicants that they must complete a lengthy and doubtless time-consuming process of contesting the public-

---

[8]  At this stage it is impossible to determine if anyone actually received these notices because Waffle House has refused to produce even redacted notices sent to rejected applicants.  Plaintiff has filed a motion to compel disclosure of these records.  [DE 93, 94.]  Testimony from Public Data suggests that such notices were only sent for a short period of time.  *See* 2nd Stringfellow Depo 126:21-132:6 (noting that communications from rejected Waffle House applicants ceased after Public Data asked Waffle House to stop sending the notices).

record information directly at the source.  (Fervier Depo, Ex., 20 at WH000260.)  In like manner, the adverse-action notices again fail to inform applicants that they may contest the contents of the report directly with the CRA and also fail to inform applicants that they may receive a free report from the CRA within sixty days of the notice.  *See* 15 U.S.C. § 1681m(a).  (Fervier Depo, Ex. 20 at WH000261.)

Because the forms allegedly sent to rejected applicants were virtually identical, common questions predominate over any individual questions.  *See In re Farmers Ins. Co., Inc., FCRA Litig.*, No. CIV-03-158-F, 2006 WL 1042450, at *6 (W.D. Okla. Apr. 13, 2006) (certifying adverse action class based on the content of the notices); *Milbourne*, at *11.

### iii.  *Common Questions Predominate Regarding Damages.*

Plaintiff seeks only statutory and punitive damages on behalf of himself and the class under section 1681n, not actual damages.   This claim is susceptible to common proof—namely, Defendants' state of mind in implementing their policies and procedures.  *Berry*, *supra*, 807 F.3d at 610 ("If Lexis unreasonably failed to treat Accurint reports as 'consumer reports' subject to the FCRA, then every class member would be entitled uniformly to the same amount of statutory damages, set by rote calculation."); *Chakejian*, *supra*, 256 F.R.D. at 500; *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952-53 (7th Cir. 2006); *Schaffer v. Litton Loan Servicing, LP*, 2009 WL 9436302, at *8 (C.D. Cal. Jan. 20, 2009). Individualized inquiries are unnecessary.  *See In re Farmers Ins. Co., Inc.*, FCRA Litig., 2006 WL 1042450, at *9 (W.D. Okla. Apr. 13, 2006) ("the recovery of statutory damages under the FCRA is not dependent on proof of injury or harm. Therefore, plaintiffs are not required to present individualized proof of injury from each class member to obtain an award of statutory damages.")(citations omitted).

iv.     *Arbitration Does Not Raise Individual Questions.*

Waffle House may argue that individualized issues arise because Waffle House has a policy of requiring employees to submit to individual arbitration.  First, this concern is obviated for the large number of class members who applied to work at Waffle House but were rejected.  Because Waffle House did not hire these class members, they did not sign Waffle House's arbitration agreement and therefore are not subject to it.  (Fervier Depo 302:19-303:16.)  Therefore, to the extent Waffle House's arbitration agreement creates manageability problems, the class can be limited solely to rejected job applicants.  Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *Midland Funding, LLC v. Brent*, 2010 WL 4628593, at *4 (N.D. Ohio 2010) (rejecting the argument that the presence of an arbitration agreement with some of the unnamed class members barred certification, stating that "[a]ny arbitration related defenses that Midland and MCM have to claims of certain class members may be dealt with pursuant to Fed.R.Civ.P. 23 at a later stage in the litigation, through the creation of subclasses, or by eliminating some members of the class.")

Moreover, the enforceability of the arbitration agreement raises a common question—especially in light of the National Labor Relations Board's recent ruling striking down Waffle House's class-action waiver.[9]  *See Waffle House, Inc.*, 363 NLRB No. 104 (2016), attached to Kachadoorian Decl. as Ex. K; *see also Lewis v. Epic Sys. Corp.*, No. 15-2997, 2016 WL 3029464, at *4 (7th Cir. May 26, 2016)(invalidating class-relief waiver under Section 7 of the NLRA).  Courts routinely grant certification in such cases.  *See Ehret v. Uber Techs., Inc.*, 2015 WL

---

[9]  Waffle House's motion to compel individual arbitration after this decision, together with its total failure to bring this case to the Court's attention, is questionable.  *See* Florida Rules of Professional Conduct 4-3.3(a)(3) (stating that "[a] lawyer shall not knowingly: [¶] fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel").

7759464, at *14 (N.D. Cal. Dec. 2, 2015)(certifying class where enforceability of arbitration provision presented a common question); *Mora v. Harley-Davidson Credit Corp.*, 2012 WL 1189769, at *13 (E.D. Cal. Apr. 9, 2012), report and recommendation adopted, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012) ("The possibility that Harley may seek to compel arbitration against individual Class members does not predominate over the many common issues necessary to determine Harley's liability to the Class.")(colleting cases).

### 2.   Class Treatment Is Superior to Other Alternatives.

Because Waffle House failed to provide pre- and post-adverse-action notices, class members are unaware that their rights have been violated and would not bring individual actions. *See Bonner v. Team Toyota LLC*, 2006 WL 3392942, at *5 (N.D. Ind. Nov. 21, 2006) ("[M]any of the persons in these classes may be unaware that the form letter sent by Defendants may violate the FCRA, and a class action suit may help to safeguard their rights."). Moreover, Rule 23(b)(3) was designed for situations where, as here, the amount in controversy for any individual claimant is small, but injury in the aggregate is substantial. *See Murray*, *supra*, 434 F.3d at 953; *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 678 (D. Md. 2013). Absent class-action treatment "there is unlikely to be any meaningful enforcement of the FCRA by consumers whose rights have been violated[.]" *White v. E-Loan, Inc.*, 2006 WL 2411420, at *9 (N.D. Cal. Aug. 18, 2006).

### III.   In the Alternative, the Court Should Defer Ruling on Plaintiff's Motion until Further Discovery Is Completed.

Where a defendant provides discovery responses that consist largely of objections, thus frustrating the plaintiff's investigation, courts readily grant motions to continue the briefing schedule for class certification—otherwise the defendant's discovery abuse would be rewarded. *See Network Tallahassee, Inc. v. Embarq Corp.*, 2010 WL 4569897, at *1 (N.D. Fla. Sept. 20,

2010); *Callaway v. Exposaic Indus., Inc.*, 1982 WL 155095, at *3 (N.D. Ga. June 25, 1982). Here, Defendants have engaged in discovery abuse, necessitating Plaintiff to file two motions to compel further responses against Waffle House. [DE 93, 94.] The history of discovery abuse is set forth in each of Plaintiff's motions to compel. (*Id.; see also* Kachadoorian Decl., ¶¶ 5-16.) Briefly, Waffle House contended, belatedly, that Plaintiff's claims were arbitrable and refused to respond to discovery until the Court rejected its Motion for a Protective Order on April 28, 2016. [DE 92.] Waffle House did not serve amended responses or documents until May 2, 2016, and produced documents as recently as May 23, 2016—days before Plaintiff deposed Waffle House's corporate designee and while counsel was traveling for depositions in this case. (Kachadoorian Decl. ¶ 15.)

Moreover, neither Waffle House nor Public Data made deponents available until the last week of May. (*Id.* at ¶ 14.) At that point, of course, it was impossible to conduct follow-up discovery, both written and oral, or compel further responses. (*Id.*) And Defendants' corporate designees were largely ignorant of the topics set forth in the deposition notices. (*Id.* at ¶ 15; *see also* Fervier Depo 251:21-252:11 ("I would say that Jeff Wright was involved on a day-to-day basis in the background checks from the time I left until the present. So certainly, he would know specifics of what was happening on a daily basis greater than I would. I mean, that's obvious."); 2nd Stringfellow Depo 184:5-11 ("Q: The information in Public Data's databases relates to particular people though, correct? A: It may or may not. I don't know.").)

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court certify the proposed class, appoint Plaintiff to serve as class representative, and appoint Plaintiff's counsel to serve as class counsel. In the alternative, the Court should defer ruling on Plaintiff's motion for certification until further discovery can be had.

DATED:   June 6, 2016

/s/ Justin Kachadoorian
Anthony J. Orshansky
(admitted *pro hac vice*)
Alexandria R. Kachadoorian
(admitted *pro hac vice*)
Justin Kachadoorian
(admitted *pro hac vice*)
COUNSELONE, PC
9301 Wilshire Boulevard Suite 650
Beverly Hills, CA 90210
Tel: (310) 277.9945
Fax: (424) 277.3727
anthony@counselonegroup.com
alexandria@counselonegroup.com
justin@counselonegroup.com

Michael J. Pascucci
Fla. Bar No. 83397
Joshua H. Eggnatz, Esq.
Fla. Bar. No.: 0067926
EGGNATZ, LOPATIN & PASCUCCI, LLP
5400 S. University Drive, Ste. 413
Davie, FL 33328
Tel:  (954) 889-3359
Fax:  (954) 889-5913
Mpascucci@ELPLawyers.com
JEggnatz@EggnatzLaw.com

*Attorneys for Plaintiff William G. Jones*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of June 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Justin Kachadoorian